IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 5:18CR448 |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | |
| PHILIP M. POPA, JR., | ) | UNITED STATES' SENTENCING |
| | ) | MEMORANDUM |
| Defendant. | ) | |

The United States of America, by its counsel, Justin E. Herdman, United States Attorney, and Carol M. Skutnik, Assistant United States Attorney, respectfully submits this memorandum setting forth the United States' position regarding the sentencing for Defendant Philip M. Popa, Jr.  For the reasons set forth below and those to be articulated at the sentencing hearing, the United States submits that a Guideline sentence of 168 months is appropriate in this case.

                                            Respectfully submitted,

                                            JUSTIN E. HERDMAN
                                            United States Attorney

By:    /s/ Carol M. Skutnik
          Carol M. Skutnik (OH: 0059704)
          Assistant U.S. Attorney
          Suite 400, U.S. Courthouse
          801 West Superior Avenue
          Cleveland, Ohio 44113–1852
          Tel. No. (216) 622-3785
          E-mail: carol.skutnik@usdoj.gov

I.        **FACTUAL BACKGROUND**

To support its sentencing position, the United States offers the following summary of Defendant Popa's conduct. The United States also refers the Court to the description included in the Presentence Investigation Report ("PSR"). (R. 35: PSR, PageID 428-30).

        A.        THE FREENET PROGRAM LEADS INVESTIGATORS TO POPA

The investigation in this case began with on undercover officer using "Freenet" — which is an Internet-based, peer-to-peer (P2P) network that allows users to anonymously share files, chat on message boards, and access websites within the network. The investigation revealed that Popa requested pieces of several child pornography files from a law enforcement Freenet computer.

On April 21, 2018, Popa requested from a law enforcement computer pieces of a folder titled "Alena 3yo an dDad (2014).7z. The folder is known to contain images that depict a prepubescent child exposing her genitalia as well as an adult male hand observed spreading the child's genitalia apart for the camera.

On April 21, 2018, Popa requested from a law enforcement computer pieces of a color video that depicts a prepubescent toddler female being tortured. Throughout the video an adult female can be seen rubbing ice cubes on the toddler's genitalia, binding the toddler with rope, hanging the child upside down, duct taping her and dripping wax onto her genitalia.

On April 21, 2018, Popa requested from a law enforcement computer pieces of a color video that depicts a screaming toddler female bound with rope that is forced to perform oral sex on an adult woman. The child is duct taped, beaten, and raped with an object before being burnt with candle wax.

FBI Task Force Officer ("TFO") Ryan Anschutz was able to track the Internet Protocol ("IP") Address used to request these files back to a house in Beach City, Ohio, where Popa was staying. A federal search warrant was executed on July 18, 2018, and Popa was located in an upstairs bedroom. Also present was the homeowner and a young female child. The mother of the child was later located and interviewed. She advised that she had been living in the house for 8 months with her daughter and fiancé and that Popa would sometimes babysit her daughter.

  B.  THE INTERVIEWS WITH POPA

    1.  Popa's interview with TFO Anschutz

Popa agreed to speak with investigators and gave a confession that evolved over time. At the outset, Popa described himself as a "computer guy" and stated that people would contact him when they needed help with their computers. He initially stated that he never intentionally viewed child pornography but that occasionally "pop-ups" or advertisements would appear on his computer. For example, he claimed that he received an advertisement for "CP – a thousand DVD's for $300." Popa told investigators that he did not believe he had child pornography on his computer but clarified there could be stuff that they would consider to be child pornography.

Popa went on to describe himself as "naturally curious" and said he started searching after he heard people talking about child pornography on the internet. According to Popa, he had trouble finding it at first and was then horrified by what he saw. He described a video he watched where a man and his girlfriend raped and killed a little girl. He remembered that the woman did something to the child with ice. This description matched the torture video requested by Popa on Freenet.

Popa confirmed that he used Freenet to find this video and others. He described Freenet as a "mirror of the actual internet" and it worked by breaking down data, scattering it, and then

3

reassembling it. He also stated that it was a method for storing data. Popa stated that when he searched for child pornography, he didn't find that using common terminology was very helpful. He used a crawler to search through Freenet which pulled web-sites from active and inactive lists of web-sites.  He told investigators he looked up stuff that he shouldn't have looked up.  He then denied ever masturbating to child pornography.

## 2. The Polygraph Examination

Popa's statements to the polygraph examiner evolved in a similar fashion.  He told SA Paul Pape that he started looking for child pornography in the last six months and would look at it daily, then once every two weeks.  He denied having a preference for any particular age and again claimed that he did not fantasize or masturbate to child pornography.  During the examination, Popa denied any sexual activity or contact with a child.  Popa was informed by the examiner that he was reacting strongly to several of the questions and was not being truthful with his answers.

Popa then brought up an incident that occurred in a hospital waiting room with the daughter of a friend.  He claimed that someone had complained to hospital staff that he was sitting too close to the child and his conduct was inappropriate.  When asked to clarify his story, Popa remained vague and unable or unwilling to clarify the hospital story.

Popa then told SA Pape about a dream experience he had in 2014.  In convoluted fashion, he described a dream where a Minor Female (name and identifiers withheld to protect the minor) performed oral sex on him while he was sleeping.  In the conversation that followed, Popa claimed that he was a heavy sleeper and did not wake up during the oral sex but woke up afterwards due to the cold he felt on his exposed penis.  Popa then admitted that the incident was not a dream.  However, he persisted with his story that the Minor Female was the aggressor

4

when she unzipped his pants in the middle of the night and performed oral sex on him. He claimed he did not say anything because he did not want to start anything with her parent.

### 3. The Forensic Review of Devices

A forensic review of Popa's devices revealed 6,092 images and 130 videos of child abuse material. At least one of the child pornography videos was 58 minutes long. There were an additional 239,000 images and 94 videos of child exploitive material that was age difficult or depicted child erotica, as well as 713 images of computer generated child pornography. The collection included the following video described by Popa during his interview with TFO Anschutz:

> A color video that is approximately 5 minutes and 43 seconds long. A prepubescent toddler female is observed laying on her back on a mattress with an adult female with exposed breasts in a mask sitting next to her. Throughout the video the toddler can be heard crying and screaming. The toddler is observed with a diaper on and exposed breasts. The adult female spreads the legs of the toddler, removes the diaper to expose her genitalia. The adult female takes ice cubes and rubs the ice all over the body of the toddler and her genitalia. At approximately 2 minutes into the video, the adult female is observed binding the toddlers feet with rope to a wooden rod, keeping her feet and legs spread apart. The adult female then proceeds to hang the toddler upside down about the mattress and duct tapes her hands to the mattress then places duct tape over the toddler's mouth. The adult female then begins to physically strike with an open hand, the toddlers exposed genitalia several times. The adult female then puts, what appears to be wooden clothespins, on the toddlers exposed nipples and genitalia, while continuing to smack the toddlers exposed genitalia with an open hand. The adult female then lights a candle on fire and proceeds to drip hot wax on the toddler's exposed genitalia.

5

## II.　APPLICABLE LEGAL STANDARDS

### A.　LEGAL PRECEDENT FOR GUIDELINE SENTENCE

The United States' request a Guideline sentence of 168 months, consistent with the law and research highlighting the danger posed by child pornography offenders. Numerous courts have emphatically expressed the wretched consequences of child pornography. For example, the Court in United States v. Cunningham, 680 F. Supp. 2d 844, 847 (N.D. Ohio 2010), *affirmed* 669 F.3d 723 (6th Cir. 2012), imposed a guideline sentence on a child pornography defendant. In denying the defendant's challenge to the legitimacy of the child pornography guideline, the same one that applies to Popa, the court reasoned:

> There can be no keener revelation of a society's soul than the way in which it treats its children. Given the current statistics surrounding child pornography, we are living in a country that is losing its soul.
>
> Child pornography is a vile, heinous crime. Mention the term to your average American and he responds with immediate disgust and a sense of unease. However, once it enters the legal system, child pornography undergoes sterilization. The sterilization goes far beyond properly removing emotion from sentencing decisions. Images are described in the most clinical sense. Victims all too often remain nameless. The only emotions on display are those of defendants, sorry that their actions were discovered by law enforcement.

#### 1.　Popa's attack on the Guidelines is not persuasive

Popa, while trying to walk a tight rope on the agreed Guidelines range, takes a shot at the U.S. Sentencing Guidelines for child pornography offenses. This argument dates back to an article written in 2008 by Troy Stabenow, an Assistant Federal Public Defender from the Western District of Missouri, called Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines. Essentially, Stabenow opined that § 2G2.2 was based on emotional fears rather than empirical study, and thus resulted in every offender receiving the

6

statutory maximum sentence. Central to his thesis was the notion that child pornography offenders are not as dangerous as Congress thinks.

Shortly thereafter, a district court in Wisconsin glommed onto the opinion piece, lifting whole sections in support of a variance.[1] Very quickly, additional courts latched on to the opinion piece, using it to support their "policy disagreements" with the § 2G2.2 guideline.[2] Other courts, however, have since scrutinized the Stabenow argument, and found it failing in many respects. For example, the Court, recognizing that there is no dispute that certain enhancements apply in nearly every child pornography case, still rejected the a priori assertion that "frequency of application" equates to "lack of utility."[3] Indeed, the Court observed "the frequency of the enhancements was expressly acknowledged by the Commission when it set the base offense levels for these offenses."[4] Moreover, the court expressly rejected the "frequency of application" as a negation of the § 2G2.2 guideline by noting that an opposite conclusion should be drawn instead: "[T]he fact that more than fifty percent of offenders have over 300 images and that over sixty-percent have sadistic and masochistic images supports a conclusion that even more harsh sentences are required for deterrence."[5] The court handily exposed another central flaw in the Stabenow argument:

---

[1] United States v. Hanson, 561 F. Supp. 2d 1004, 1005 (E.D. Wis. 2008). Interestingly, Hanson engaged in conduct that the United States Sentencing Commission has since determined should be considered as aggravating (discussed below), such as active communication with other offenders.

[2] See United States v. Grober, 595 F. Supp. 2d 382, 394 (D.N.J. 2008) aff'd, 624 F.3d 592 (3d Cir. 2010) (listing decisions that used the research in Stabenow's post).

[3] United States v. Cunningham, 680 F.Supp.2d 844, 851–853 (N.D. Ohio 2010).

[4] Id. at 851-852.

[5] Id. at 852-853.

> The assertion that sentences should be reduced because it is easy to accumulate a large number of pictures quickly also rings hollow. The Court does not dispute that it is very likely that a defendant could acquire more than 600 images with just a few mouse clicks and several emails. But that number of images is not collected by accident. Instead, those images are sought out by a troubled mind, from like-minded individuals. Thus, a defendant makes a cognitive choice to seek out that level of images. Moreover, the Court has never before seen an argument that because a crime is easy to commit, it should be punished less severely. Robbery is certainly simplified from the criminal's perspective by the use of a firearm and the choice of a feeble, elderly victim. The Guidelines, however, do not lessen punishment because the crime was easier to commit. In fact, seeking out a vulnerable victim leads to a 2–level enhancement under the Guidelines. U.S.S.G. § 3A1.1(b)(1). This Court, therefore, will not alter its sentence simply because accessing and growing a database of child pornography has become easier as technology has advanced.[6]

In addition, the Sixth Circuit has repeatedly rejected Popa's argument, attacking the child pornography Guidelines as numerous and excessive enhancements that appear in nearly every child pornography case. *United States v. Lester*, 688 F. App'x 351, 352 (6th Cir. 2017) (quoting *United States v. Walters*, 775 F.3d 778, 787 (6th Cir. 2015)). "The[se] enhancement[s] remain[] relevant—regardless of [the] frequency of application—because the harm [they] address[] [are] real." *Walters*, 775 F.3d at 787. *See also United States v. Cunningham*, 669 F.3d 723, 733. "[A] district court is entitled to rely on the § 2G.2.2 enhancements unless it has a reasonable policy basis for not doing so." *Id.* (citing *Bistline*, 665 F.3d 758, 761 (6th Cir. 2012) and *United States v. Brooks*, 628 F.3d 791, 799 (6th Cir. 2001)).

---

[6] United States v. Cunningham, 680 F.Supp.2d at 851–53 (emphasis in original); see also United States v. Johnson, 765 F. Supp. 2d 779, 782 (E.D. Tex. 2010) ("Gratuitous attacks on the Guidelines or Congress by a defendant for 'policy reasons' add nothing to the analysis of a particular case, or to the law in general. Claiming that there is a disparity between the Guidelines sentence for a first-time offender who has visually raped numerous children and one who has possessed illegal drugs ignores congressional intent to 'avoid unwarranted sentence disparities among defendants ... guilty of similar conduct.'").

2. <u>The Studies support the serious nature of child pornography offenses.</u>

While it is absolutely true that the § 2G2.2 guideline is higher than it was in the 1990s, both Congress and the courts have access to more and better information about child pornography offenders. In fact, recent research published in the Journal of Sexual Aggression demonstrates that Congress's so-called "meddling" in § 2G2.2 was justified:

> Crimes involving the possession, distribution, or manufacture of child pornography constitute violations of specific laws pertaining to the receipt and transmission of child abuse/exploitation images, and as a result there is a tendency for some individuals to assume these offenders are somehow distinct from child molesters (i.e., 'hands-on' abusers). This assumption, in fact, is a key reason why recent years have seen an increase in judicial sentences that fall below sentencing guidelines (United States Sentencing Commission, 2012), a trend that may be attributable to an impression that the rate of 'crossover' between child pornography collection and hands-on abuse is low (Eke & Seto, 2011; Endrass et al., 2009; Seto, Hanson, & Babchishin, 2011).
>
> The logic of this conceptual view is somewhat befuddling. It ignores the observation that individuals who molest children and those who download and masturbate to child pornographic images share a primary motivational pathway - both are sexually aroused by minors (Seto et al., 2006). It therefore should come as no surprise that offenders whose sexual fantasies and urges involve children are able to derive pleasure and gratify their deviant impulses through a variety of means, and it suggests that significant 'crossover' may exist between these crimes.
>
> Although some research (Elliott, Beech, Mandeville-Norden, & Hayes, 2009; Howitt & Sheldon, 2007; Webb, Craissati, & Keen, 2007) has shown differences between groups of 'online' and 'offline' offenders, most is limited by an important assumption; that is, an individual is a hands-off offender simply because official records do not reflect contact sexual offending. This assumption appears unwise, given the base rates for detecting sexual abuse are extraordinarily low, the finding that most victims of abuse never report their victimization to law enforcement, and the low percentage of arrests leading to convictions (Centers for Disease Control and Prevention, 2010; National Centers for Policy Analysis, 1999; US Department of Justice, 2010, 2012). *Researchers should never assume an offender has not committed a*

9

> *hands-on crime merely because his or her criminal record does not reflect such a charge or conviction.* [7]

This study goes on to describe its own processes as well as results.  The study was comprised of 127 persons under investigation for the possession, receipt, or distribution of child pornography who agreed to take a polygraph examination regarding their hands-on activity.[8]  These individuals had no known history of hands-on offending.[9]  Six individuals (4.7%) admitted to sexually abusing at least one child prior to the polygraph.[10]  However, during the polygraph procedures, an additional 67 individuals (52.8%) of the study sample provided disclosures about hands-on abuse they had perpetrated.  That means a total of 57.7% of the sample admitted to *previously undetected hands-on sexual offenses*.[11]  For children and judges, that percentage gives worse odds than a coin-toss.  Even more shocking is the total number of hands-on victims for these 73 individuals:  282 children, nearly four per offender.[12]

This study is important because it supports the results of prior studies, i.e., that child pornographers have high rates (as high as 85%) of previously unreported sexual offenses against children.[13]  This should come as little surprise, as other studies that relied solely upon prior

---

[7] M.L. Bourke, et. al., "The use of tactical polygraph with sex offenders," *Journal of Sexual Aggression* (2014), p. 5-6 (emphasis added).

[8] Id. at 8.

[9] Id.

[10] Id.

[11] Id.

[12] Id. at 9, Table I.

[13] Michael L. Bourke & Andres E. Hernandez, "The 'Butner Study' Redux: A Report on the Incidence of Hands-On Child Victimization by Child Pornography Offenders," 24 *Journal of Family Violence* 183 (2009) (study of 155 federal child pornography offenders in the United States who participated in the residential sex offender treatment program at FCI Butner from 2002–05; finding that official records, including the offenders' presentence reports in their child pornography cases, revealed that 26% had previously committed a contact sex offense, yet

official reports (arrests or convictions) showed a 20-28% association between child pornography offenses and contact sex offenses.[14] Despite these peer-reviewed studies that support lengthy sentences, some courts continue to view these offenders as simple voyeurs of relatively low risk, cowing to the hyperbolic and distinctly un-empirical criticisms of the § 2G2.2 guideline, using those criticisms as the sole basis for variance.

Another more recent study by DeLisi, et al involving federal sex offenders has reached similar findings.[15] The 2016 DeLisi study revealed that non-contact sex offenders, such as those convicted of possession of child pornography, are very likely to have a history of contact sexual offending.[16] This study involved 119 federal sex offenders from 2010-2015, for which 69% reported a contact sex offense during polygraph examination, divulging 397 victims.[17] Of the

---

finding that "self reports" of the offenders in therapy revealed that *85% had committed prior "hands on" sex offenses*)(emphasis added); see also The Report, Ch. 7, p. 173 ("The six self-report studies taken together reported a rate of *55 percent*.").

[14] Janis Wolak et al., "Child Pornography Possessors: Trends in Offender and Case Characteristics," 23 *Sexual Abuse: A Journal of Research & Treatment* 22, 33–34 (2011) (finding, based on 2006 data from surveys of approximately 5,000 law enforcement officials throughout the United States, that 21% of cases that began with investigations of child pornography possession "detected offenders who had either committed concurrent sexual abuse [offenses] or been arrested in the past for such crimes"); Richard Wollert et al., "Federal Internet Child Pornography Offenders — Limited Offense Histories and Low Recidivism Rates," in *The Sex Offender: Current Trends in Policy & Treatment Practice* Vol. VII (Barbara K. Schwartz ed., 2011) (based on a study of 72 federal child pornography offenders in the United States who were treated by the authors during the past decade, the authors found that 20, or 28%, had prior convictions for a contact or non-contact sexual offense, including a prior child pornography offense).

[15] Matt DeLisi, et al., (2016),"The dark figure of sexual offending: new evidence from federal sex offenders," *Journal of Criminal Psychology*, Vol. 6, Iss. 1, pp. 3 – 15.

[16] Id. at 11.

[17] Id. at 5, 7.

119 participants, 57 had been convicted of only possession or receipt of child pornography.[18] More than half of the offenders in the highest number-of-victims category (10 or more) had been convicted of possessing or receiving child pornography.[19] The two most prolific offenders – with 22 and 24 victims – were child pornography offenders.[20] The study concluded "the current analyses indicate that child pornography offenders are significantly more severe than their instant conviction offense indicates. More often than not, they are contact sexual abusers." [21]

      The United States does not ask the Court to use the Bourke study, or any of the studies discussed, as proof of uncharged crimes. However, the United States does submit that these studies highlight the seriousness of the offense, as well as the rightness of Congress's intervention. These two studies show that "lay people's intuition" and Congress has been right all along and that Congressional "meddling" in the § 2G2.2 guideline was justified. These studies demonstrate that earlier judicial reliance upon the Stabenow mythology was unfortunately misplaced and that judicial variances downward, based solely upon a "policy disagreement" with the formulation of the § 2G2.2 guideline, are unsupportable if not irresponsible. In sum, these studies support the Government's request for a high end sentence.

---

[18] Id. at 6.
[19] Id. at 7, 11.
[20] Id. at 11.
[21] Id.

### III. APPLICATION OF § 3553(A) FACTORS

#### A. NATURE AND CIRCUMSTANCES OF THE OFFENSE

The Government refers to the Statement of Facts section herein and Defendant's PSR for descriptions of the nature and circumstances of the offenses in the case at bar.

#### B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

According to the PSR, Popa was sent to live with his grandparents from the age of five. His grandparents were of the Mennonite religion and raised him in a very strict environment. Although Popa claims that his grandfather was physically and emotionally abusive, he stated that he had an otherwise normal childhood in a good neighborhood, free of drugs and violence.

Popa also appears to be educated, in part by home-schooling, and stated that he obtained his GED while contemplating joining the Army. He worked as a truck driver until an incident in his truck where he injured his shoulder. His work history dates back to 2006 and he does not report any substance abuse issues.

#### C. NEED FOR THE SENTENCE IMPOSED TO REFLECT SERIOUSNESS OF OFFENSE, PROMOTE RESPECT FOR THE LAW, AND PROVIDE JUST PUNISHMENT

Popa amassed a collection of child pornography that would make most observers vomit from its content. The level of depravity and deviance captured in the images he possessed is lost in mere physical descriptions.

In Bistline, the Sixth Circuit noted a reasonable sentence must reflect the seriousness of the offense or provide for any general or specific deterrence. United States v. Bistline, 665 F.3d 767-68 (6th Cir. 2012). A sentence at the low end of the Guidelines range would offend the seriousness of the offense and the impact on its victims. Congress has plainly indicated "[e]very instance of viewing images of child pornography represents a . . . repetition of their abuse." 18 U.S.C. § 2251 (Historical and Statutory Notes: Child Pornography Prevention of 2006, Pub. L.

13

No. 109-248, Title V, § 501, July 27, 2006, 120 Stat. 587, 623 (2006)). The words of Congress and many courts echo the victims themselves. For many victims, the downloading of images is just as traumatic as the initial act of abuse. These victims express embarrassment of being depicted in these extremely vulnerable situations. They also express fear of being watched and subsequently recognized by people like Popa who fixate on videos and images of them.

Defendant committed child exploitation offenses in the comfort and privacy of his own home, and he alone is responsible for his actions and the impact they have had on the children depicted in those images.

### D. NEED FOR SENTENCE TO AFFORD ADEQUATE DETERRENCE

Congress, the Supreme Court, and the Sentencing Commission believe general deterrence is a very important factor when considering an appropriate sentence. United States v. Irey, 612 F.3d 1160, 1206 (citing United States v. Ferber, 458 U.S. 747, 760 (1982) (The most expeditious if not the only practical method of law enforcement may be to dry up the market for [child pornography] by imposing severe criminal penalties on persons selling, advertising, or otherwise promoting the product); Osbourne v. Ohio, 495 U.S. 102, 109-10 (1990) (It is also surely reasonable for the State to conclude that it will decrease the production of child pornography if it penalizes those who possess and view the product, thereby decreasing demand); United States v. Goff, 501 F.3d 250, 261 (3rd Cir. 2007) (Deterring the production of child pornography and protecting the children who are victimized by it are factors that should have been given significant weight at sentencing.); United States v. Barevich, 445 F.3d 956, 959 (7th Cir. 2006) (The avenue Congress has chosen to weaken the child pornography industry is to punish those who traffic in it. Transporting and receiving child pornography increases market

demand. The greater concern under the Guidelines is for the welfare of these exploited children.). In United States v. Goldberg, 491 F.3d 668, 672 (7th Cir. 2007), the court opined:

> Young children were raped in order to enable the production of the pornography that the defendant both downloaded and uploaded, consumed himself and disseminated to others. The greater the customer demand for child pornography, the more that will be produced. Sentences influence behavior, or so at least Congress thought when in 18 U.S.C. § 3553(a) it made deterrence a statutory sentencing factor. The logic of deterrence suggests that the lighter the punishment for downloading and uploading child pornography, the greater the customer demand for it and so more will be produced.

In fact, the Bistline Court reversed a district court that failed to see any importance in general deterrence. See United States v. Bistline, 665 F.3d 758, 767 (6th Cir. 2012). The district court stated, "general deterrence . . . will have little [if] anything to do with this particular case." Id. The Sixth Circuit found "that [the district court's] statement is inexplicable, and in any event conflicts with our statement that 'general deterrence is crucial in the child pornography context[.]'" Id. (citing United States v. Camiscione, 591 F.3d 823, 834 (6th Cir. 2010)).

Despite the fact that Popa and others who have an overwhelming interest in the sexual assault of young children may not be deterred even if the sentence for the crimes was life, it is also true that others would certainly not be deterred if Popa received a low sentence. These offenders do talk to each other via the Internet and they are concerned enough about law enforcement that they encrypt their hard drives, seek foreign websites, and use anonymous phone apps in an effort to prevent detection. There is much to be gained by a significant sentence—increased safety for our children.

IV. **MONETARY PENALTIES**

    A. FINE

The Government concedes Popa does not have the current ability to pay a fine in this matter and suggests that an analysis of Popa's future ability to make money should be directed toward his special assessment.

    B. 18 U.S.C. § 3014 ADDITIONAL SPECIAL ASSESSMENT

Popa is also subject to a mandatory $5,000 Additional Special Assessment under 18 U.S.C. § 3014. The statute states, in pertinent part:

> Beginning on the date of enactment of the Justice for Victims of Trafficking Act of 2015 and ending on September 30, 2019, in addition to the assessment imposed under section 3013, **the court shall assess an amount of $5,000 on any non-indigent person or entity convicted of an offense under**—
>
> **(1)** chapter 77 (relating to peonage, slavery, and trafficking in persons);
>
> **(2)** chapter 109A (relating to sexual abuse);
>
> **(3) chapter 110 (relating to sexual exploitation and other abuse of children)**;
>
> **(4)** chapter 117 (relating to transportation for illegal sexual activity and related crimes)....
>
> 18 U.S.C. § 3014(a) (emphasis added).

These assessments are deposited in the Domestic Trafficking Victims' Fund and awarded as grants or enhanced programming for victims. 18 U.S.C. §§ 3014(c) and (e)(1). Because Defendant has been convicted of an offense under Chapter 110, the Court must impose this additional special assessment unless it finds he is unable to pay; however, both Defendant's current and <u>future</u> financial status is to be evaluated when making the indigency determination under § 3014. See <u>United States v. Shepherd</u>, 922 F.3d 753 (6th Cir. 2019). See also  <u>United</u>

States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018). That is, negative net worth at the time of sentencing is not dispositive of the issue. United States v. Kelley, 861 F.3d 790, 801-802 (8th Cir. 2017). If "at some point" a defendant would be able to pay the Additional Special Assessment, "[t]his ability to earn money in the future preclude[s] a finding of indigence for purposes of § 3014." Id.

This is consistent with a similar finding by another Judge in this District on August 20, 2018, in United States v. Phillip Carl, case number 3:17CR159, in which the defendant was represented by a Federal Defender's Office due to a finding of indigency. The Court, relying on the PSR, found a present inability to pay, but found Carl was part-owner of property and also young enough that work following release was likely. See also, United States v. Lail, 2018 WL 2771112 (4th Cir. 2018), (imposition of the $5,000 assessment warranted based on future ability to pay following sale of defendant's house even though indigent at sentencing, represented by the Federal Defender, and unable presently to pay); United States v. Rodgers, 711 F. App'x 229, 230 (5th Cir. 2018) (citing United States v. Magnuson, 307 F.3d 333, 335 (5th Cir. 2002) ($5,000 assessment warranted where defendant had title to certain assets and potential employability sufficient to pay even though PSR found present inability to pay). As the Tenth Circuit noted, "nothing in the statute precludes an examination of future ability to pay as part of a holistic assessment of the indigency determination." United States v. Janatsch, 722 F. App'x 806, 810-11 (10th Cir. 2018). On the contrary, as the Court in that case noted, "[the defendant]'s going to have plenty of time to pay that off while incarcerated." Id. at 806, 810-11. That is precisely the case here. Even in the absence of assets, Popa will be in prison for at least the next 5 years, much longer if a Guideline sentence is imposed, and during that time, he can participate in the IFRP, which affords him the future ability to pay both the fine and additional

17

special assessment.  In fact, the fine will not expire for 20 years from the date of his release from custody. 18 U.S.C. § 3613(b).  In addition, he demonstrates future potential employability, both in the institution and beyond, with which to make payments and consequently, Popa should be ordered to pay the $5,000 additional special assessment.

**V.     CONCLUSION**

For these reasons and those to be articulated at the sentencing hearing, the United States respectfully requests that the Court impose a term of imprisonment of 168 months.

Respectfully submitted,

JUSTIN E. HERDMAN
Acting United States Attorney

By:     /s/ Carol M. Skutnik
Carol M. Skutnik (OH: 0059704)
Assistant U.S. Attorney
801 West Superior Avenue, Suite 400
Cleveland, Ohio 44113
Tel. No. (216) 622-3785
E-mail: carol.skutnik@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on June 14, 2019, copy of the foregoing Government's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.

/s/ Carol M. Skutnik
Assistant U.S. Attorney